Carr, J.
There is pretty strong evidence, that before the execution of the deed of trust by John and William De Baptist of the 3rd April 1819, under which Beck claims, they had received from Benjamin, a conveyance of his equity under his contract with Head, and that this was shewn to Beck to induce him to make the loan. But I do not consider this point as material. It would only be proof that Benjamin had abandoned his interest in the contract to them ; and that is otherwise clearly established.
Subsequent to the execution of the deed of trust to Beck, and with notice of it, Edward De Baptist, another brother, received from Benjamin a deed for this same equity; and all the De Baptists joined in conveying the same to Long, who also had notice of Beck’s lien. Long sold to Adams. The legal title being still in Head, Beck filed this bill calling for it, making the De Baptists, Long and Adams parties, and praying to subject the lot to sale in satisfaction of his debt. Head, answers admitting the contract, the transfer of it by Benjamin to John and William, and the performance on their part; (he does not in his answer, indeed, admit full payment, but it was afterwards admitted by his counsel.) In this state of the case, there seems to mo nothing for the statute of frauds to operate upon. It was not pleaded; but it was urged, in the argument, as bearing upon the transfer *356 of the contract from Benjamin to his brothers John and William. But I cannot think that this is either within the words or the mischief of the statute. The contract for the sale of lands, which the statute requires to be in writing, is here, ^le contract between Benjamin and Head; which was reduced to writing. By furnishing the bricks, building the house, and paying the 100 dollars, Benjamin would have acquired a right to call on Head for the legal title. He transferred to his brothers, the right to stand in his shoes; that is, to do the work, and pay the money : Head accepted them : but this gave them nothing but the privilege of performing the conditions of the written contract; and upon such performance, an equity to call upon Head for the legal title to the lot; a matter (as it seems to me) wholly beside the statute.
The only question, then, is, who has the best right to call for the legal title, which Head is willing to make ? Adams relies a good deal, in his answer, on his being a purchaser without notice : but of what is he a purchaser? Not of the legal title, but at most of an equity; which equity, if Beck had acquired before him he must prevail; the rule in such cases being prior in tempore, potior in jure. That Beck was first in time is admitted; but it was objected in the argument, that it no where appears, that his deed was recorded; and that being a deed of trust, it cannot take effect, as to a subsequent purchaser without notice, except from the time of such recording. But I think that upon this record we are bound to take this as a recorded deed. The parties on both sides have so treated it; and the fact is in no shape put in issue. There is evidence also, that it was recorded ; and that all parties knew, and never meant to question, the. fact that it was recorded. Nor was there any defence for Adams, so natural or ready as to have stated in his answer, that the deed had never been recorded, if the fact had been so ; but no such thing is done. Under these circumstances, I feel no doubt, that we must take this as a recorded deed; and that the plaintiff has the best right to call for the legal title, so far as is necessary to the satisfaction of his claim.
*357 Tucker, P. The legal title to the land conveyed by the deed of trust, in this case, is in Head. There are two antagonizing claimants, each insisting on his preferable right to call for the legal title. The first is Beck, who claims by deed of trust under John and William lie Baptist: the other is Adams, who claims also under John and William He Baptist, but likewise sustains his right by claiming under Benjamin. Let us then contrast his rights with those of Beck, under both aspects of bis title.
1. Supposing Adams to derive bis right from John and William: in this aspect, he has but an equity posterior to that of Beck, to which it must yield, unless he can shew himself a purchaser without notice. This he cannot do, if the deed of trust under which Beck claims, was duly recorded. Whether it was or not, has not been put in issue; and, perhaps, we ought to take for granted, that there was no just objection to it on that score ; but it will be safest, in sending the cause hack, to leave that matter open to inquiry. If the deed was duly recorded before Adams’s purchase, 1 am clearly of opinion, that it takes precedence of Adams’s title, so far as that title is claimed under John and William He Baptist.
2. Supposing Adams to derive his title from Benjamin He Baptist, let us compare the conflicting rights of himself and Beck to call for the legal title. Has Benjamin He Baptist, or Adams as claiming under him, any right whatsoever to call for the title from Head, even if Beck’s claim were out of the case ? I think not. For, 1. there is now no contract between Benjamin and Head. There was a contract at first, and a contract by which Head agreed to convey him the lot in question. But the parties had a right to abandon, waive or rescind that contract; and that abandonment, waiver or rescission, might be such as to absolve the vendor from it, and to exclude the vendee from a right to a specific performance. Has the vendee Benjamin He Baptist, by his acts in this case, so absolved the vendor? Can he under the circumstances, demand a specific execution by *358 a conveyance to himself or to those claiming under him? He cannot; for it is proved, that in the fall after the contract, Benjamin called on him to transfer the contract to John and William, and it was agreed that they should have the contract, and build the house, which he had engaged to build. An indorsement was accordingly made on the contract, with the assent of Benjamin, though he did not sign it, and it was afterwards read to John and William, who assented to it, though they did not sign it. Yet they went on to do the work ; they went on to borrow money to complete the building; they went on to fulfil the contract. On what ground, then, can Benjamin expect the specific performance of the contract, expressly waived and rescinded by himself, and entered into with bis consent by Head with his two brothers. Has he paid any purchase money? Has he given any consideration to entitle him to a conveyance ? Has he fulfilled the contract on his part, so as to entitle him to demand performance from Head? By no means. He has never paid one cent; he has never given any consideration; he has never moved one step towards performance.
But suppose a specific performance decreed in his favor or in favor of his vendee: how will the matter stand with Head and John and William JDe Baptist ? As the lot will not go to pay John and William for their work, they must either go unpaid, or they must look to Head, and Head must pay them. But as they entered upon the work, upon the faith of the arrangement made with Head with Benjamin’s assent and concurrence, they must not go unpaid, while Benjamin gets the lot for nothing. If Head cannot convey them the lot, he must pay them their money. Then, how will he stand ? He will have conveyed away .his lot to Benjamin for nothing, and paid the full value of his building to John and William, who really erected it. Can this be tolerated ? Shall Benjamin be permitted to waive the contract in behalf of his brothers,—to draw Head thereby into an engagement with them, and then to recant, reassert his right, get the property for nothing, and force Head to pay them for their la *359 bour ? It is impossible. Benjamin, therefore, could have no title to specific performance; and Adams stands but in his shoes.
On the other hand, Benjamin having assented to turn the contract over to bis brothers, and Head and the brothers assenting thereto, they became entitled to a conveyance from Head upon fulfilling the contract on their part. This equitable right they conveyed to a trustee to secure to Beck the 500 dollars borrowed of him, it seems, to enable them to comply with their bargain. This sum they must repay to Beck, and the lot is liable for that repayment.
I am, therefore, of opinion to reverse the decree and send the cause back for further proceedings, with instructions that Beck’s deed of trust shall have preference over Adams, unless it should appear that the deed of trust was not duly recorded.
Cabell and Brooke, J. concurred in the opinion of the president, and a decree was entered accordingly.